IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NATIONS FIRST MORTGAGE, LLC,          :
STEVEN PARISI, DONALD KISHBAUGH,      :
and ROSE PERDUE,                      :
                        Plaintiffs    :
        v.                            :          3:CV-05-2527
                                      :          (JUDGE VANASKIE)
TUDOR INSURANCE COMPANY,              :
                        Defendant     :

## MEMORANDUM

At issue in this insurance declaratory judgment action is coverage under two

consecutive "claims made" insurance policies for six separate legal actions brought against

Plaintiffs.  Specifically, Plaintiffs seek a determination that Defendant Tudor Insurance

Company ("Tudor") is obligated to provide indemnification and the costs and expenses incurred

in defending these actions.  A stipulated record has been submitted, both parties have provided

briefs supporting their respective positions, and oral argument has been conducted.  For the

reasons that follow, I find that Tudor has no obligation to defend or indemnify Plaintiffs under

the policies in question for any of the six litigations.

I.  BACKGROUND

        A.  The Insurance Policies

        During the time relevant to this litigation, Plaintiff Nations First Mortgage, LLC ("Nations

First") was a limited liability company acting as a mortgage broker in Pennsylvania.[1]  (Stipulated Record "SR", Dkt. Entry 29, at 2.)  Plaintiff Donald Kishbaugh was the President of Nations First, Plaintiff Rose Perdue was an employee/owner of Nations First, and Steven Parisi was Vice President of Nations First.  (Id. at 2.)  Parisi also was an owner of Eagle Valley Homes and Eagle Valley Homes North, Inc.  (Id.)  Parisi and Kishbaugh conducted business in land development and residential lots sales under the following entities: P&K Developers, P&K Developers, LLC, and Mobile Developing Company.  (Id. at 3.)

Tudor, a non-admitted insurer (qualified as an "eligible surplus insurer" under 40 Pa. Cons. Stat. § 991.1602), annually issued to Nations First "claims made and reported" Errors and Omissions Liability Policies between June 17, 1999, and June 17, 2005.  (Id. at 3.)  A Mortgage Services Endorsement, identified in the policy form (declarations page) as number "TU 65," was first included in the policy issued for the period June 17, 2001, to June 17, 2002, and included thereafter.[2]  (Id. at 4.)

Nations First was a client of James & Rae Insurance, Inc., an insurance agency, or

---

[1]For the convenience of the reader of this Memorandum Opinion in electronic format, hyperlinks to the Court's electronic record and to authority cited herein have been created.  No endorsement is intended by the insertion of hyperlinks to a particular provider of authority in electronic format.  Also for convenience, references to the record will be to the document number and pagination generated by the electronic case filing system ("CM/ECF") listed at the top of each page of the documents filed by the parties, rather than to the exhibit number or deposition transcript used by the parties.

[2]Perdue testified that Nations First did not receive a copy of any of the insurance policies until it received a denial letter from Tudor.  (Dep. Perdue, Dkt. Entry 35-3, at 53.)

producing broker under 40 Pa. Cons. Stat. 991.1602. (Id. at 10.) Nations First enlisted the services of James & Rae to procure Errors and Omissions coverage. Ron Hlavaty, an insurance agent of James & Rae, contacted W.N. Tuscano Agency Inc. ("Tuscano"), a surplus lines licensee under 40 Pa. Cons. Stat. § 991.1602, which worked in Pennsylvania for Tudor.[3] (Id. at 4.) Tuscano, in turn, contacted Tudor for the requested coverage. The policies provided coverage of up to $1,000,000 for all claims. (Dkt. Entry 42, 1-6.)

In Nations First's application for insurance in April of 1999, in response to question 20, "Give an example of a claim that you intend to have insured under this policy," the application states: "Error in application processing which will cause bank to require buyback of mortgage." (Dkt. Entry 34-3, at 90.) In Nation's First renewal application of June of 2003, the same response is given. (Dkt. Entry 34-2, at 97.)

The two policies at issue in this litigation are EOP 0023907, for the period from June 17, 2003, to June 17, 2004, and EOP 0025384, for the period from June 17, 2004, to June 17, 2005. (Id., at 4.) The insured identified on the declarations of each policy is Nations First. (Id.; Application, Dkt .Entry 42, at 8.)

The policies provide, in part, the following:

> The Company will pay on behalf of the Insured all sums in excess of the deductible that the Insured shall become legally obligated to pay as damages

---

[3]According to Hlavaty, this was the first time his company sold an "error and omissions" policy. (Hlavaty Dep., Dkt. Entry 34-2, at 17.)

3

because of claims first made against the Insured and reported to the Company during the policy period. This policy applies to actual or alleged negligent acts, errors or omissions arising solely out of professional services rendered for others as designated in Item 3 of the Declarations.

For this coverage to apply, all of the following conditions must be satisfied:

    1. the negligent act, error or omission arising from professional services took place subsequent to the Retroactive Date stated in Item 7 of the Declarations;

    2. the insured had no knowledge prior to the effective date of this policy of such actual or alleged negligent act, error, omission or circumstance likely to give rise to a claim;

    3. claim is first made against the insured and reported to the Company during the policy period.

(Id. at 4-5.)

The term "insured" in the policies is defined as follows:

    The term "insured" shall mean the insured shown in the Declarations and any other person acting within the scope of his duties as a past or present partner, principal, officer, director or employee of the Insured.

(Id. at 5.) The term "loss" in the policies is defined as: "damages, judgment and claims

expenses." (Id.)

Pertinent exclusions from coverage are as follows:

    Coverage provided in this policy does not apply to any loss in connection with or arising out of or in any way involving:
    . . . .

A. Any dishonest, fraudulent, criminal or malicious act or omission of the Insured.

4

B.  The liability of others assumed by the insured under any contract or agreement whether written or oral unless specifically endorsed to this policy.

C.  Punitive or exemplary damages, fines or penalties.

. . . .

(Id. at 5-6.)  The Mortgage Services endorsement ("TU 65"), first added to the policy effective June 17, 2001, provided, inter alia, that there was no coverage with respect "to any claim based upon or arising out of . . . the Insured's failure to repurchase any loan(s)."  (Id. at 8.)

The policies require notice of any claims as follows:

The insured shall, as a condition precedent to their right to the protection afforded by this insurance, give to the Company as soon as practicable, notice

1.  of any claim made against them; or

2.  on the receipt of notice from any person of an intention to hold the Insured responsible for the results of any breach of duty; or

3.  of an incident or circumstances that may give rise to a claim, including the reason for anticipating a claim, with full particulars as to dates and persons involved.

The insured shall in any case, upon request, give the Company such information as the Company may reasonably require.  In the event that a claim is made or a suit is brought against the Insured, the insured shall IMMEDIATELY forward to the Company every demand, notice, summons or other process received by this Insured or its representatives.

(Id. at 7.)

By letter dated October 31, 2001, Tuscano sent to James & Rae the renewal policy for Nations First, "which replaces all binders and policies previously issued."  (Dkt. Entry 35, at 70.)

The letter requested that James & Rae review the policy with Nations First to assure that the desired coverage has been issued, and that Nations First understood any limitations. (Id.) The declarations page for this renewal policy plainly references endorsement TU 65, and a copy of the endorsement is in the James & Rae file for Nations First. It thus appears that Nations First's agent had the TU 65 endorsement at that time.

On September 30, 2003, Tuscano again wrote to James & Rae, enclosing the latest policy. (Dkt. Entry 35, at 43.) The letter further states: "Please review the policy with the insured to be certain that we have issued the coverage as desired, and that you and the insured understand any limitations and/or warranties made by the insurer." (Id.)[4]

B. The Indymac Action

On May 3, 2004, Indymac Bank, FSB, brought suit against Nations First in the Superior Court of the State of California (the "Indymac case"), which is captioned Indymac Bank, FSB v. Nations 1st Mortgage Company, LLC, Case No. BC 314997 (SR, Dkt. Entry 29, at 9.) On June 28, 2004, Indymac filed a First Amended Complaint. (Id. at 9.) In its First Amended Complaint, Indymac sought to obligate Nations First to repurchase mortgages that were sold to Indymac because the loans allegedly did not satisfy Indymac's criteria. (Id. at 9.) Specifically, Indymac

---

[4]At his deposition, Mr. Hlavaty produced his agency's file for Nations First. The file included the endorsement TU-65. Mr. Hlavaty, however, could not confirm when he received the endorsement. (Hlavaty Dep., Dkt. Entry 34-2, at 24.) It should be noted, though, that Hlavaty plainly had notice of the existence of TU 65, if not its actual content, no later than his receipt of the declarations page for the June 17, 2001 renewal policy.

alleged that Nations First represented and warranted that each loan had no material

misstatements or omissions.  (Dkt. Entry 30, at 58.)  It was further alleged that Nations First

agreed to indemnify Indymac or repurchase the loans if the contract was breached.  (Id. at 60.)

The first seven causes of action were for breach of contract for individual loans extended by

Nations First.  The eighth cause of action sought specific performance, requiring Nations First

to purchase any and all loans mentioned in the Amended Complaint.  (Id. at 70.)  The ninth

cause of action alleged Nations First was required to indemnify Indymac for losses in

connection with the loans.  (Id. at 70-71.)  The final six causes of action alleged negligent

misrepresentation on behalf of Nations First in procuring and funding the loans for individual

home buyers.  (Id. at 71-84.)

Nations First tendered the claim to Tudor under policy number EOP 023907, which

extends coverage from June 2003 to June 2004.  (Id. at 9.)  Tudor denied the claim and notified

Nations First.  (Id. at 9.)  The Indymac case ultimately settled for a total of $70,000.  (Id. at 9.)

Nations First incurred $125,921.02 in fees and costs in the defense of the Indymac case.  (Id.)

The settlement agreement included the following entities and individuals: Nations First; Steve

Parisi; Donald Kishbaugh; Rose Perdue; P&K Developers, LLC; Eagle Valley Homes, Inc.;

Eagle Valley Homes North Incorporated; Mobile Developing Company; Nations First Mortgage

Company; Eagle Mountain Mortgage Company; Steven Parisi and Donald Kishbaugh d/b/a/

P&K Developers; P&K Developers, Inc.; Nations First Mortgage Company, Incorporated; and

Nations First Brokers Corp.  (Id.)

    C.  The Commonwealth Action

    On August 25, 2004, Nations First, along with others, was sued in the Commonwealth Court of Pennsylvania in an action in equity, in a case captioned <u>Commonwealth of Pennsylvania, Gerald J. Pappert, Attorney General v. Steven Paul Parisi, et al.</u>, No. 612 MD 2004 (the "Commonweath Action").  (SR, Dkt. Entry 29, at 9.)  A permanent injunction against the defendant was sought.  (<u>Id.</u> at 9.)  About one year before this lawsuit was filed, the Monroe County District Attorney announced an investigation into Eagle Valley Homes, Inc.  (<u>Id. at 10.</u>)  The following month, Rose Perdue testified before a grand jury investigating mortgage fraud issues in Monroe County, Pennsylvania.  (<u>Id.</u> at 10.)  On November 18, 2003, Pennsylvania Sate Investigators seized computer date and paper files from the offices of Nations First, Eagle Valley Homes Inc., P&K Developers, P&K Developers LLC, P&K Developers Inc., and Mobile Developing Company, located at 1 Pilgrim Way in Brodheadsville, Pa.  (<u>Id.</u> at 10.)  On January 23, 2004, the "Pocono Record," a newspaper with circulation in Monroe County, Pennsylvania, reported that the State Attorney General's office was conducting a criminal investigation of Eagle Valley Homes for possible home sale fraud.  (<u>Id.</u> at 10.)

    Nations First applied for renewal of its errors and omission policy with Tudor, effective June 17, 2004, but did not disclose these significant events.  There is no evidence that Tudor was aware of these facts when it renewed the coverage.

The Commonwealth Action asserted violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-1 to -9.3., and sought a permanent injunction restraining Nations First and other affiliated companies from engaging in "unfair methods of competition or unfair deceptive acts or practices in the conduct of any trade or commerce declared unlawful . . . ." (Id. at 4.) In addition, the Commonwealth sought civil penalties under the Pennsylvania Consumer Protection Law. (Id.)

Count I of the Complaint alleged, among other things, that: Nations First and other Defendants "deliberately did not disclose" a second mortgage on a HUD-1 Settlement Sheet" in a transaction with certain home buyers, (id. at ¶¶ 75, 235); the "[d]efendants Parisi, Kishbaugh, and Perdue conspired to 'bury' closing costs thereby artificially inflating the value" for home buyer Charmaine Cooper, (id. at ¶ 96); an individual signed a HUD-1 Settlement Statement with inaccurate information based on misleading representations by Defendants, (id. at ¶¶ 114-115); the defendants colluded to "maximize their profit on the home" of home buyer Renee McIver-Cole in overstating the value of the home (id. at ¶¶ 167-173); the defendants "deliberately omitted" information from a HUD-1, (id. at ¶ 187), and "deliberately failed" to identify a payment as proceeds from a second mortgage, (id. at ¶¶ 251, 472); the "[d]efendants worked in concert to maximize their profit and to design the Wilson sales transaction to fail," (id. at ¶ 310); "Defendant Steven Parisi reported anticipated monthly income for [home buyer] Joseph Whetsell as actual and past income," and manipulated the sale and financing in his

corresponding transaction, (id. at ¶¶ 336, 344); "Steve Parisi and Rose Perdue 'backdated' documents related" to a second mortgage with home buyer Joanne Valle, misrepresented monthly payments to several home buyers, and "routinely brokered unaffordable loans based on the inflated values of the properties . . . ." (Id. at ¶ 485). The Complaint further alleged that this conduct was fraudulent and deceptive and was performed in a willful fashion. (Id. at ¶¶ 504 & 505.)

Count II alleged similar willful violations under the Pennsylvania Consumer Protection Law. (Complaint, Dkt. Entry 36-2, at 8.) Count III alleged willful violations of the UTPCPL for discouraging and disparaging consumer use of independent legal counsel. (Id. at 9 & 12.) Count IV alleged wilful violations of the UTPCPL for representations made to consumers about property tax amounts. (Id. at 13 & 15.) Count V alleged Defendants Eagle Valley Homes, Inc. and Steven Parisi willfully failed to perform in a workmanlike manner in violation of the Consumer Protection Law. (Id. at 16 & 22.) Count VI alleged violations of the Federal Truth in Lending Act and Regulation "Z" by Nations First and other Defendants for personally participating in and benefitting from unfair and deceptive trade practices. (Id. at 26.) Count VII alleged a violation of the UTPCP for "Bait and Switch" by Nations First and other Defendants in willfully misrepresenting goods and services. (Id. at 27 & 29.). Finally, Count VIII alleged violation of the Consumer Protection Law for willful use of a confession of judgment clause or other forfeiture language in contracts. (Id. at 29, 30 & 32.)

On September 28, 2004, Tudor notified Nations First that the Commonwealth action was not covered by Tudor Insurance policy No. EOP 0025384, which governed claims made between June 17, 2004 and June 17, 2005. (SR, Dkt. Entry 29, at 11.) Among the reasons for disclaiming coverage was the policy's fraud exclusion.

The Commonwealth Action was eventually settled by virtue of a Consent Petition dated March 23, 2006, entered into by Rose Perdue, Donald Kishbaugh, and Steven Parisi, among others. (Id.) The Consent Petition provided that "Defendant Steve Paul Parisi, acting in his capacity as President of Eagle Valley Homes, Inc., was required to pay $1 million dollars ($1,000,000) to the Commonwealth of Pennsylvania." (Id.) The payment included $750,000 to create a consumer restitution fund, $125,000 in fines, and $125,000 for exemplary damages in the form of costs of investigation for future public protection purposes. (Id.)

D. The <u>Wilson</u>, <u>Hearns</u>, <u>Jeppson</u> and <u>Alvarez</u> Actions

On August 2, 2004, Almus Wilson and others sued Nations First and other defendants in this Court. (Id.) The plaintiffs, purchasers of property in the Pocono Mountain region of Pennsylvania, alleged they were victims of a predatory lending scheme aimed at low income, unsophisticated home buyers lured into Pennsylvania by misleading advertisements. They asserted claims under the Racketeer Influenced and Corrupt Organizations Act ("Racketeering Act"), 18 U.S.C. §§ 1961-1968, and violations of the UTPCPL. Summary judgment was granted in favor of the defendants, and against all plaintiffs other than Mr. and Mrs. Wilson.

See Wilson v. Parisi, 549 F. Supp. 2d 637 (M.D. Pa. 2008).  The Wilsons' claims ultimately

settled on the eve of trial.  See Wilson v. Parisi, Dkt. Entry 434 (60 day order of dismissal).

The record does not contain any documentation that Plaintiffs gave Tudor notice of the

Wilson action; nor is there any letter from Tudor denying coverage.  (Id. at 11-12.)  Tudor

claims it did not receive notice of this lawsuit during the policy period, i.e., June 17, 2004 to

June 17, 2005.

On February 15, 2005, Gaines E. Hearns, Jr., also a purchaser of property in the

Pocono Mountain region of Pennsylvania, sued Nations First and other defendants in this

Court, asserting the same claims presented in the Wilson action.[5]  On March 21, 2005, Esther

Jeppson, another purchaser of property in the Pocono Mountain region of Pennsylvania, filed a

similar action against Nations First and other defendants in this Court.[6]  Lastly, on March 29,

2005, David and Patricia Alvarez, purchasers of property in the Pocono Mountain region of

Pennsylvania, brought another similar action against Nations First and other defendants in this

Court.[7]  Tudor did not receive notice of the Hearns, Jeppson, or Alvarez action until it was

served with the Complaint in the present matter on November 8, 2005, after the expiration of

---

[5]Summary judgment was granted in favor of the defendants.  See  Hearns v. Parisi, 548 F. Supp. 2d 132 (2008).

[6]Summary judgment was granted in favor of the defendants.  See Jeppson v. Parisi, 3:CV-05-0564, Dkt. Entry 97 (M.D. Pa. Oct. 4, 2007).

[7]The action was dismissed for failure to prosecute.  See Alvarez v. Parisi, 3:CV-05-00624, Dkt. Entry 58 (M.D. Pa. June 18, 2007).

the coverage period on the claims made policy.  (Id. at 12.)

## II.  DISCUSSION

### A.  The Wilson, Hearns, Jeppson, and Alvarez Actions

Tudor asserts that Nations First failed to comply with the notice requirements contained in insurance policy EOP 0025384 by not reporting the Wilson, Hearns, Jeppson, and Alvarez lawsuits during the policy period.  (Br. Opp'n, Dkt. Entry 38, at 3.)  The parties agree that the policies issued by Nations First are "claims made" policies, and not "occurrence" based policies. (SR, Dkt. Entry 29, at 3.)  In this regard, "reporting requirements in claims-made policies are strictly construed and enforced; if an insured does not give notice within the required time, 'there is simply no coverage under the policy.'"  4th Street Investments, LLC v. Dowdell, No. 08-1512, 2009 WL 1904620, at *1 (3d Cir. July 2, 2009) (citing City of Harrisburg v. Int'l Surpluse Lines Ins. Co., 596 F. Supp. 954, 961 (M.D. Pa. 1984) aff'd mem., 770 F.2d 1067 (3d Cir. 1985)).  Pennsylvania courts have confirmed that an insurance company need not prove prejudice when denying coverage for lack of notice in connection with a claims-made policy. See ACE Am. Ins. Co. v. Underwriters at Lloyds and Cos., 939 A.2d 935, 940-41 (Pa. Super. Ct. 2007), aff'd mem., 971 A.2d 1121 (Pa. 2009).

Nations First advances several arguments to avoid the consequence of the failure to give notice of the lawsuits during the policy period.  First, it asserts that it had no knowledge of the notice requirements because it never received a copy of the insurance policy.  (Br. Supp.,

Dkt. Entry 41, at 25-26). The evidence in the stipulated record, however, includes a letter dated July 19, 2004, from Tuscano to James & Rae regarding policy No. EOP 0025384, indicating the policy is enclosed. (Dkt. Entry 34-2, at 65; see also Hlavaty Dep., Dkt. Entry 34-2, at 13.) Nations First has not questioned the authenticity of this letter. Moreover, Hlavaty testified that he generally received Tudor policies from Tuscano. (Hlavaty Dep., Dkt Entry 34-2 at 12-13.) Hlavaty had extensive experience as an insurance broker. He is a certified insurance counselor, and has worked in the insurance industry since 1987. (See Hlavaty Dep., Dkt. Entry 34, at 100.)

Because Hlavaty secured insurance for Parisi and some of Parisi's businesses, (see Hlavaty Dep., Dkt. Entry 34-2, at 7), and Nations First admits it was a client of James & Rae, (SR, Dkt. Entry 29, at 4), a principal-agent relationship existed. See Scott v. Purcell, 415 A.2d 56, 60 (1980) ("The basic elements of agency are 'the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.' " (quoting Restatement (Second) of Agency § 1 cmt. b (1958))). Hence, any knowledge of James & Rae is imputed to Nations First. See Workmen's Comp. Appeal Bd. v. Evening Bulletin, 445 A.2d 1190, 1192 (Pa. 1982) ("It is well settled in the law of this jurisdiction that knowledge of an agent, acting within the scope of his authority, real or apparent, may be imputed to the principal, and therefore, knowledge of the agent is knowledge of the principal.") (citations omitted); Indovina v. Metro.

14

Life Ins. Co., 5 A.2d 556, 558 (Pa. 1939) (" 'The general rule which imputes an agent's knowledge to the principal is well established. The underlying reason for it is that an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest.' " (quoting Mutual Life Ins. Co. v. Hilton-Green, 241 U.S. 613, 622 (1916))); see also St. Louis Fire & Marine Ins. Co. v. Witney, 96 F. Supp. 555, 561 (M.D. Pa. 1951)("'Notice to the agent, when it is the duty of the agent to act upon such notice, or communicate it to his principal in the proper discharge of his duty as agent, is notice to the principal, and applies to the agents of corporations as well as of others.'").[8]  Thus, I find James & Rae had knowledge of the contents of the insurance policy, and impute this knowledge to Nations First.

Next, Nations First argues that the Tudor policies are ambiguous as to when notice should be given.  (Br. Supp., Dkt. Entry 41, at 24-26.)  It argues that Article I(A)(3) requires notice of a claim within the policy period, while Article V(A)(1)(2) requires it to provide notice to Tudor of a claim "as soon as practicable."  As a result, argues Nations First, the two should be construed together as allowing Nations First "to provide reasonable notice."  (Id. at 26.)

Where the terms of a contract are clear and unambiguous, they must be given their "plain and ordinary meaning."  St. Paul Fire & Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431

---

[8]It also bears mentioning that Plaintiffs did provide timely notice of the Indymac and Commonwealth actions.

(3d Cir. 1991). As explained by the Pennsylvania Supreme Court:

> A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

Murphy v. Duquesne Univ. of the Holy Ghost, 777 A.2d 418, 429-30 (Pa. 2001). To the extent that ambiguities exist, they are to be construed in favor of the insured, and against the insurer.

Pizzini v. American Int'l Specialty Lines Co., 210 F. Supp. 2d 658, 667 (E.D. Pa. 2002).

Here, the notice provisions are clear and unambiguous as to the requirements for notice of a claim. Indeed, the two policy provisions can be construed together. In Section I(A), the contract states: "For this coverage to apply, all of the following conditions must be satisfied." One of these conditions is the claim is "reported during the policy period." (Dkt. Entry 30, at 19.) Section V(A) states: "The Insured shall, as a condition precedent to their right to the protection afforded by this insurance, give to the Company as soon as practicable, notice: (1) of any claim made against them . . . ." (Id.) A logical reading of these two provisions demonstrates there are at least two conditions that must be satisfied in reporting a claim: (1) the claim is reported during the policy period; and (2) the claim is reported as soon as practicable. There is no inconsistency in the provisions. See Keystone Fabric Laminates, Inc. v. Federal Ins. Co., 407 F.2d 1353, 1356 (3d Cir. 1969). ("It is axiomatic in contract law that

two provisions of a contract should be read so as not to be in conflict with each other if it is reasonably possible.")  Similar language in other "claims made" policies has been found clear and unambiguous in imposing upon the insured the obligation of providing notice within the policy period.  E.g., Pizzini, 210 F. Supp. 2d at 668.

Nations First persists that, with regard to the Wilson claim, it complied with the notice requirement, relying on the testimony of Perdue and Hlavaty.  (Br. Supp., Dkt. Entry 41, at 26.) Ms. Perdue testified that she dropped off a copy of the Wilson complaint with James & Rae. (Perdue Dep., Dkt. Entry 35-3, at 42.)  Hlavaty testified that he learned of the lawsuit filed by the Wilsons from several sources, specifically mentioning the newspaper.  (Hlavaty Dep., Dkt. Entry 34-2, at 2.)  Nations First concludes that, since Tudor cannot rebut Ms. Perdue's testimony that she notified Hlavaty of the lawsuits, Tudor was timely notified of the Wilson action.

The unsound premise of Nations First's argument is that telling Hlavaty of the Wilson lawsuit is sufficient to put Tudor on notice of a claim.  Hlavaty's knowledge can only be imputed to Tudor if he is an agent of Tudor.  See Workmen's Compensation Appeal Bd., 445 A.2d 1192. "As a general rule, [ however,] an insurance broker is initially the agent for the insured." Selected Risks Ins. Co. v. Schwabenbauer, 540 F. Supp. 22 (E.D. Pa. 1982)  An insurance broker may be deemed an agent of the insurer and not the insured only if there is "'some evidence of an authorization, or some fact from which a fair inference of an authorization by the

company might be deduced to make an insurance broker the agent of the company . . . .'"
Taylor v. Crowe, 282 A.2d 682, 684-85 (Pa. 1971) (quoting Couch on Insurance, 2d, Section 25:95)).

Nations First has not submitted evidence that Hlavaty was an agent of Tudor.  In fact, the evidence supports the contrary conclusion.  Hlavaty testified that he did not go directly to Tudor to procure insurance policies.  (Hlavaty Dep., Dkt. Entry 34-2, at 3 & 4.)  He could not even contact Tudor directly  (See id. at 17.)  If Hlavaty received notice of a claim from Nations First, he would turn it over to Tuscano, which would be then be responsible for sending it to Tudor.[9]  (Id. at 4.)  Hlavaty saw himself as representing Nations First.  (Hlavaty Dep., Dkt. Entry 34-2, at 12.)  Moreover, Tudor is an "eligible surplus lines insurer" under 40 Pa. Cons. Stat. § 991.1602, which means Tudor must rely on Tuscano, a "surplus lines licensee," to conduct business in Pennsylvania.  Considering this evidence, it is clear that Hlavaty did not have authorization to act on behalf of Tudor and that notice of a claim provided to Hlavaty did not put Tudor on notice of the claim.

Finally, Nations First argues that the filing of the present action put Tudor on notice of

---

[9]Hlavaty did not have in his files any documents showing that notice was given to Tudor regarding the Wilson claim.  (Hlavaty Dep., Dkt. Entry 34-2,  at 3.)  He did, however, submit a claim with regard to the Indymac action, which was in Tudor's files as having been sent to it by Tuscano. (Dkt. Entry 35, at 4; see Hlavaty Dep., Dkt. Entry 34-2, at 3-4.)

the Hearns, Jeppson, and Alvarez lawsuits.[10] (Br. Supp., Dkt. Entry 41, at 27-28.) Nations First claims it attempted service on Tudor commencing July 15, 2005, which is one month after the expiration of the policy. (Id., at 28.) Tudor was then, argues Nations First, on constructive notice.[11] (Id.) As already mentioned, "reporting requirements in claims-made policies are strictly construed and enforced . . . ." Dowdell, No. 08-1512, 2009 WL 1904620, at *1. Even if Tudor was on notice as early as July 15, 2005, this is still after the June 17, 2005 policy expiration date. Thus, "there is simply no coverage under the policy." Id. (internal citations omitted). Accordingly, Plaintiffs' claims with respect to the Wilson, Hearns, Jeppson and Alvarez actions fail by reason of not having given Tudor notice of the claims during the policy period.

C. The Indymac Action

Tudor argues that the Mortgage Services Endorsement contained in policy EOP 023907, covering the period June 17, 2003, to June 17, 2004, precludes coverage of the Indymac action. (Reply Br., Dkt. Entry 43, at 4.) The endorsement provides: "In consideration of the payment of the premium, it is hereby understood and agreed that this policy does not

---

[10]Nations First also argues it did not give Mr. Hlavaty the Hearns, Jeppson, and Alvarez lawsuits because it "expected another rejection letter." (Oral Argument Tr., Dkt. Entry 46, at 28.) An expectation that coverage will be rejected, of course, does not relieve a party from a contractual obligation to provide notice of a claim.

[11]In the Stipulated Record, the parties agree that Tudor did not know of these pending lawsuits until it was sued by Tudor in this present action. (SR, Dkt. Entry 29, at 11-12.) The present action was served on Tudor on November 8, 2005. (Id. at 12.)

apply to any claim based upon or arising out of: . . . (8) the Insured's failure to repurchase any loan(s) . . . ."[12] (Dkt. Entry 30, at 14.)

Nations First claims the Mortgage Services Endorsement is invalid because it defeats its reasonable expectations of coverage for mortgage buyback claims. In Nations First's initial application for insurance in April of 1999, in response to question 20, "Give an example of a claim that you intend to have insured under this policy," the application states: "Error in application processing which will cause bank to require buyback of mortgage." (Dkt. Entry 34-3, at 90.) In Nations First's renewal application of June of 2003, the same response is given. (Dkt. Entry 34-2, at 97.) Nations First argues that in seeking coverage from Tudor, it wanted coverage from "errors in application processing which would cause a bank to require the buy back of a mortgage." (Br. Supp., Dkt. Entry 41, at 17.) Nations First further alleges that it never knew that the Mortgage Services Endorsement precluded the requested coverage. Consequently, Nations First believes "Tudor deceptively led [it] to believe it was insured for mortgage repurchases and early payment defaults." (Id. at 18.)

Our Court of Appeals has synthesized the standard of the reasonable expectation doctrine under Pennsylvania law in the following manner:

An analysis of the reasonable expectations of the insured is rightly employed

---

[12]Nations First admits that if the "TU 65" is enforceable, then Tudor would not have a duty to indemnify. (Oral Argument Tr., Dkt. Entry 46, at 31.) Nations First took no position on the duty to defend.

when a claimant alleges that the insurer engaged in deceptive practices toward the insured, either to misrepresent the terms of the policy or to issue a policy different than the one requested by the insured and promised by the insurer. In this context, the clear and unambiguous language in the policy is one aspect of the totality of the circumstances that may lead to the reasonable expectations of the insured. An insured may not complain that his or her reasonable expectations were frustrated by policy limitations which are clear and unambiguous. However, even the most clearly written exclusion will not bind the insured where the insurer or its agent has created in the insured a reasonable expectation of coverage. Mere assertions that a party expected coverage will not ordinarily defeat unambiguous policy language excluding coverage.

West v. Lincoln Benefit Life Co., 509 F.3d 160,169 (3d Cir. 2007) (internal citations omitted);

see also Standard Venetian Blind Co. v. American Empire Ins. Co., 469 A.2d 563, 566 (Pa.

1983) ("[I]n the absence of proof of fraud, 'failure to read [the contract] is an unavailing excuse

or defense and cannot justify an avoidance, modification or nullification of the contract or any

provision thereof.' ").[13]

Consideration of the factors enunciated by our Court of Appeals in West defeats

application of the reasonable expectation doctrine in this matter.[14] The initial two claims made

policies issued by Tudor did not contain the Mortgage Services Endorsement, which evidently

---

[13] "The reasonable expectations doctrine is intended to protect against the inherent danger, created by the nature of the insurance industry, of an insurer issuing a policy 'quite different from what the insured requested after the insured has already applied and paid for the policy." Alleman v. State Farm Life Ins. Co., No. 07-4283, 2009 WL 1833604, at *2 (3d Cir. June 16, 2009) (citing Tonkovic v. State Farm Mut. Auto. Ins. Co., 521 A.2d 920, 924-25 (Pa.1987)).

[14] Nations First does not argue that the Mortgage Services Endorsement is ambiguous or unclear. (Br. Supp., Dkt. Entry 41, at 18.)

was adopted by Tudor in April of 2001, during the second year of the parties' insurance relationship.[15] It is, however, identified in each of the declarations pages that accompanied each of the policies issued commencing in June of 2001. The endorsement is also mentioned in the coverage quotes that Hlavaty received. (Hlavaty Dep., Dkt. Entry 34-2, at 16.)[16] Moreover, there is reason to believe that Hlavaty received the actual endorsement with the policy issued for the period June 17, 2001 to June 17, 2002. (See Letter of Oct. 31, 2001 from Tuscano to James & Rae, Dkt. Entry 35, at 70.) Although Tudor may be criticized for not having highlighted the significance of the endorsement, there is no evidentiary foundation for a conclusion that it misled Nations First into believing it had coverage when it was excluded. On the contrary, the record compels the conclusion that Nations First's agent was given the endorsement long before the coverage year in question.

In short, Nations First's assertion of deception is not supported by the evidence in the stipulated record. On September 30, 2003, Tuscano sent a letter to James & Rae stating that policy EOP 023907 is enclosed. (Dkt. Entry 35, at 43.) The letter also states: "Please review the policy with the insured to be certain that we have issued the coverage as desired, and that you and the insured understand any limitations and/or warranties made by the insurer." (Id.)

---

[15]The Mortgage Services Endorsement bears a date of 4/01, suggesting its adoption date. (Hlavaty Dep., Dkt. Entry 34-2, at 20-21.)

[16]Hlavaty testified that it was his practice to review insurance quotes with his client. (Hlavaty Dep., Dkt. Entry 34-2, at 8.)

Furthermore, Tudor included notice of the Mortgage Services Endorsement in the policies issued for the years 2001-2002, 2002-2003, and 2004-2005.[17] The declaration page of each of these policies, along with policy EOP 023907, contained the notation "TU 65" or "65" under "Policy Form And Endorsements Attached At Inception," indicating the additional endorsement. These policy declarations and letters contain no indicia that Tudor or Tuscano misrepresented, or attempted to misrepresent, to Nations First the terms and conditions of EOP 023907.[18]

The reasonable expectations of the insured, however, may still overcome a clear and unambiguous policy exclusion "where the insurer or its agent has created in the insured a reasonable expectation of coverage." West, 509 F.3d at 169. But in this matter, there is no evidence that Tudor or Tuscano agreed to Mr. Hlavaty's additional request for coverage in the application; nor does Nations First argue that Tudor gave an oral or written representation that the request would be accepted. In fact, the reference to TU 65 on the declarations page should have caused Mr. Hlavaty, who had over twenty years of experience in the insurance industry, to determine the contents of the endorsement and advise his client accordingly. His failure to do so cannot be attributed to Tudor, with which James & Rae had no direct relationship. Thus, in

_____

[17]Tudor provided the 2001-2002 policy to James & Rae on October 31, 2001. (See Letter from Tuscano to James & Rae, Dkt. Entry 35, at 70.)

[18]Rose Perdue's testimony that Nations First expected coverage from errors in application processing which would cause a bank to require the buyback of mortgages (Perdue Dep., Dkt. Entry 35-3, at 54), is insufficient to trump the Mortgage Services Endorsement. See West, 509 F.3d at 169. ("Mere assertions that a party expected coverage will not ordinarily defeat unambiguous policy language excluding coverage.")

light of the letters and declarations in the stipulated record, it was unreasonable for Nations First to expect coverage from Tudor for errors in application processing which would cause a bank to require the buyback of mortgages. See West, 509 F.3d at 173 (the reasonable expectation doctrine is inapplicable because the letters issued by the insurer to the insured were "entirely consistent with the clear language of the policy itself . . . .")[19]

Accordingly, Plaintiffs cannot avoid the effect of the Mortgage Services Endorsement under the reasonable expectations doctrine. In light of the concession that the endorsement would negate a duty to indemnify, there is no need to consider the matter at greater length. Although the duty to defend is broader than the duty to indemnify, Air Products & Chemicals, Inc. v. Hartford Accident & Indemnity Co., 25 F.3d 177 (3d Cir.1994) ("An insurer has a duty to defend the insured when the allegations in the complaint against [the insured] could potentially fall within the coverage of the policy.") (internal citations omitted), the Indymac action plainly falls within the Mortgage Services Endorsement so as to relieve Tudor of a duty to defend that action. Therefore, Plaintiffs are not entitled to coverage for the Indymac action.

---

[19]Hlavaty testified that he did not receive any notification that Tudor was changing the policy and adding the TU 65 endorsement. But it is undisputed that he received the declarations pages listing the applicable endorsements for four consecutive years. It is also undisputed that the endorsement was included in the file he produced, along with transmittal letters in October of 2001 and September of 2003 stating that the policies accompanied the letters. It is thus reasonable to infer that Hlavaty had the endorsement in hand before the inception of the coverage year at issue with respect to the Indymac action.

24

D.  The Commonwealth Action

Nations First claims that policy no. EOP 0025384 does not cover the Commonwealth action due to operation of the "fraud" exclusion.  (Reply Br., Dkt. Entry 43, at 7.)  The fraud exclusion states that coverage "does not apply to any loss in connection with or arising out of or in any way involving: . . . (B) Any dishonest, fraudulent, criminal or malicious act or omission of the Insured."  (Dkt. Entry 30, at 20.)

Nations First agrees that the Commonwealth "complaint is basically about fraud and taking advantage of people," but argues that covered errors and omissions are also alleged in the complaint.  (Oral Argument Tr., Dkt. Entry 46, at 30.)  Tudor responds that the Commonwealth Complaint does not allege negligent acts, errors or omissions, but fraudulent, dishonest, malicious, or criminal conduct.  (Oral Argument Tr., Dkt. Entry 46, at 12-13.)

A careful reading of the Commonwealth Complaint reveals that the conduct alleged is deliberate and willful, not negligent or haphazard mistakes or errors.  (See Complaint, Dkt. Entry 36, at ¶¶ 75, 114, 115, 167-173, 187, 235, 251, 310,  336, 344, 472, & 485; Dkt. Entry 36-2, at pp. 8, 9, 12, 13, 15, 16, 22, 26, 27, 29, 30 & 32.)  It is evident that the clear and unambiguous language of the fraud exclusion squarely applies to the Commonwealth action, and Tudor had no duty to indemnify Nations First.  See Little v. MGIC Indem. Corp.,  836 F.2d 789, 793 (3d Cir. 19878) ("Where the language of the policy is clear and unambiguous, a court is required, as with any contract, to enforce that language.").

As to Tudor's duty to defend Nations First, policy EOP 0025384 provides in the first paragraph: "This policy applies to actual or alleged negligent acts, errors or omissions arising solely out of professional services rendered. . . ." (Dkt. Entry 30, at 19.) The general language of the "Exclusions" section further states: "Coverage provided in this policy does not apply to any loss in connection with . . . (B) Any dishonest, fraudulent, criminal or malicious act or omission of the Insured." (Id. at 19-20). Considering the plain meaning of these provisions, it is evident that the policy does not apply, where, as here, the action seeks recovery for losses attributable to fraudulent conduct.[20] Therefore, Tudor had no duty to defend Nations First in the Commonwealth action. See Automobile Ins. Co. of Hartford v. Morris ex rel. Morris, No. CIV. A. 97-5372, 1999 WL 159882 (E.D. Pa. Mar. 22, 1999) (insurance company had no duty to defend where the complaint against the insured alleged intentional and reckless conduct, which were specifically excluded by the policy); State Farm Fire & Casualty Co. v. Griffin, 903 F. Supp. 876, 878 (E.D. Pa.1995) (holding that the insurer did not have a duty to defend where the complaint alleged negligence but facts clearly indicated intentional conduct).

_____

[20]"When interpreting the language of an insurance policy, the words must be construed in their 'natural, plain and ordinary sense.' " Tyler v. Motorists Mutual Ins. Co., 779 A.2d 528, 530 (Pa. Super. Ct. 2001) (citing Riccio v. American Republic Ins. Co., 705 A.2d 422, 426 (1997)). Where the policy term is not defined, a court may refer to the dictionary definition of the word. Id. at 530 (citing Madison Construction Co. v. Harleysville Mutual Ins. Co., 735 A.2d 100, 106 (1999)). Black's Law Dictionary defines "coverage" as "[i]nclusion of risk under an insurance policy; the risks within the scope of an insurance policy." Black's Law Dictionary (8th ed. 2004). If there is no coverage, then an insurance company has not taken on the risk to indemnify or defend.

## III. CONCLUSION

For the reasons set forth above, I find that Tudor has no duty to indemnify or defend Nations First in connection with the six lawsuits underlying this declaratory judgment suit. An appropriate order will follow.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NATIONS FIRST MORTGAGE, LLC,          :
STEVEN PARISI, DONALD KISHBAUGH,      :
and ROSE PERDUE,                      :
                    Plaintiffs        :
        v.                            :       3:CV-05-2527
                                      :       (JUDGE VANASKIE)
TUDOR INSURANCE COMPANY,              :
                    Defendant         :

ORDER

NOW, THIS 30th DAY OF SEPTEMBER, 2009, for the reasons stated in the foregoing

memorandum, IT IS HEREBY ORDERED THAT Tudor Insurance Company has no obligation

to defend or indemnify Plaintiffs in the underlying lawsuits.  Judgment shall be entered in favor

of Defendant Tudor Insurance Company and against Plaintiffs Nations First Mortgage, LLC,

Steven Parisi, Donald Kishbaugh, and Rose Perdue.

IT IS FURTHER ORDERED THAT the Clerk of Court shall mark this matter CLOSED.

                          s/ Thomas I. Vanaskie
                          Thomas I. Vanaskie
                          United States District Judge